[780 NYS2d 8]

In the Matter of BENJAMIN L. and Others, Children Alleged to be Abused and/or Neglected. FLORENCE L., Appellant; COMMISSIONER OF THE ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent, et al., Respondent.

First Department, July 15, 2004

## APPEARANCES OF COUNSEL

*Michael C. Wroblewski*, Manalapan, for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Suzanne K. Colt* and *Pamela Seider Dolgow* of counsel), for respondent.

*Monica Drinane, The Legal Aid Society*, New York City (*Judith Stern* of counsel), *Law Guardian*.

## OPINION OF THE COURT

BUCKLEY, P.J.

This case arises from the death of Kendall B., a three-year-old child who was in the custody of respondents, his foster parents. Kendall had sustained serious burns from scalding water in a bathtub and two days later died from cardiac arrest. Following a fact-finding hearing, Family Court rejected respondents' version of how Kendall's burns happened as incredible, discounted respondents' medical expert, and found that petitioner's medical experts and a preponderance of the credible evidence supported the theory that Kendall had been intentionally placed or held in scalding water.

Respondent Freeman G. has not appealed. Respondent Florence L. does not contest the finding of neglect and derivative neglect, but contends that Family Court's findings as to abuse are not supported by sufficient evidence. I disagree and would affirm the orders appealed.

Family Court Act § 1012 (e) defines an "[a]bused child" as:

> "a child less than eighteen years of age whose parent or other person legally responsible for his care
>
> "(i) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
>
> "(ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause

death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ . . . ."

To establish a prima facie case of abuse, petitioner had to demonstrate an injury of such nature as would ordinarily not occur absent an act or omission by respondents, and that respondents were the child's caretakers at the time of the injury (*see Matter of Philip M.*, 82 NY2d 238, 243 [1993]; Family Ct Act § 1046 [a] [ii]). Thus, the Family Court Act "authorizes a method of proof which is closely analogous to the negligence rule of res ipsa loquitur," and "[i]ndeed, the statute is modeled on the res ipsa loquitur doctrine" (*Matter of Philip M.*, 82 NY2d at 244). Once a prima facie case of child abuse has been proven, the burden of explanation or of going forward shifts to respondents, although the burden of proving child abuse always remains with petitioner (*see id.*). To satisfy their burden, respondents need to provide a reasonable and acceptable explanation of how burns of such nature and degree would have happened (*see Matter of Tevon C.*, 280 AD2d 473 [2001]; *Matter of Quincy Y.*, 276 AD2d 419 [2000]). Self-serving or contradictory denials or unreasonable explanations are insufficient to rebut a prima facie abuse claim (*see Matter of Marc A.*, 301 AD2d 595 [2003]). Credibility determinations of the Family Court are entitled to great weight, since the nisi prius court is in a better position to evaluate the witnesses (*see Matter of Irene O.*, 38 NY2d 776, 777 [1975]).

Following a thorough airing of the medical and factual issues arising from Kendall's scalding and subsequent death, Family Court rendered a decision which extensively and meticulously evaluated the testimony of each witness and resolved the conflicting opinions.

Certain facts are undisputed. In December 1998, respondents lived in a three-bedroom apartment with their own three children and four foster children, including Kendall. Prior to accepting Kendall, respondents were never advised of his serious behavioral problems, including inappropriate sexual conduct, lack of proper toilet training, inability to dress or feed himself, insatiable thirst and hunger, and violent tantrums. Kendall required the services of a therapeutic day nursery and had been evaluated by a psychologist as "severely hyperactive, impulsive [and] overly aggressive." On the evening in question, Kendall urinated on himself in respondents' home. He got into a

bathtub, and Florence L. began to run the water for his bath. Kendall sustained serious burns to 20 to 50% of his body as a result of partial immersion in scalding water for 10 to 30 seconds. After that period, Florence L. removed Kendall from the water, and Freeman G. took him to the hospital.

The central factual dispute concerns whether Florence L. intentionally placed or held down Kendall in the scalding water, as the Family Court found, or whether he was momentarily left unattended in the bathtub, during which time either there was a surge of hot water or he turned the spigot, as respondents contended. However, respondents' theory also depends on a finding that Kendall remained in the water for the 10 to 30 seconds and would not have immediately screamed or tried to climb out of the tub in reaction to the high temperature because: (1) he had dull pain senses and reflexes; or (2) he feared getting into trouble.

Three medical experts testified. Dr. Steven Shapiro of the Office of the Chief Medical Examiner performed the autopsy and testified as an expert in medicine with a subspecialty in forensic pathology. He found that Kendall's body was marked by an immersion line, below which he sustained serious burns to 30 to 35% of his body, and full thickness skin loss on his forearms. The extent and quality of the burns, and the fact that the skin folds of Kendall's belly and his groin crease were relatively unaffected, indicated to Dr. Shapiro that Kendall was restrained in scalding water. Notably, Dr. Shapiro has presented a paper to the American Academy of Medical Examiners in which he advised that, even where there is no dispute that a child has been abused, it is important not to automatically conclude that the child's death was the result of the abuse, but rather to search for the possibility of natural causes.

Dr. Shapiro's essential findings were corroborated by Dr. David Bank, Chief of Pediatric Emergency Services and Director of the Division of Pediatric Emergency Medicine at New York-Presbyterian Hospital, who testified as an expert in pediatrics with a subspecialty in child abuse and maltreatment. Dr. Bank calculated the burned area of Kendall's body to be between 40 and 54%. Dr. Bank was unable to characterize the burns as having happened as a result of abuse or neglect, but he was adamant that, notwithstanding Kendall's developmental problems, his survival reflexes would have caused him to immediately escape the water or, at the very least, to scream.

The medical testimony of Drs. Shapiro and Bank, when coupled with the undisputed facts, clearly established petition-

er's prima facie case of abuse as against respondents. A child of this age and physical abilities does not normally sustain the burns from which Kendall suffered absent abuse. The burden of going forward then shifted to respondents to provide a reasonable and acceptable explanation for these injuries which caused Kendall's death. This they did not do.

Respondents relied on the expert testimony of Dr. Paul Halebian, Kendall's treating physician at the New York Hospital-Cornell Medical College, who was qualified as an expert witness in medicine with a subspecialty in burns. Dr. Halebian opined that, if left alone in the tub, Kendall could have turned the spigots to permit the introduction of scalding water for 10 to 20 seconds, and that Kendall was either unable to leave the tub or chose to remain in the scalding water to avoid punishment for having burned himself.

Family Court rejected the testimony of respondents' medical expert, based on the overall rambling, disjointed, and self-contradictory nature of his testimony, as well as his demonstrably false conclusions. Family Court's determination is amply supported by the record.

First, Dr. Halebian admitted serious error in his prior grand jury testimony concerning this incident. Specifically, he had stated that it would take only one second for hot water to cause Kendall's burns. While conceding that error at the fact-finding hearing, however, Dr. Halebian made another claim that was proven incorrect: that water temperatures in excess of 130 degrees Fahrenheit would cause pipes to explode, which conclusion he reached after consulting "The Joy of Cooking" as a scientific treatise.

Second, he operated under the assumption that no one, not even someone who wished to punish a child by dipping him into hot water, would intentionally subject such child to the danger Kendall suffered.

Third, Dr. Halebian's surmise that Kendall could not climb out of the bathtub ignored the tub's actual dimensions. The doctor believed that the tub might "seem like a mountain" to Kendall, since the tub was "slightly taller than he is," even though the top of the tub was 13 inches from the floor and 12 inches from the inside base and Kendall measured between three and four feet tall. Thus, there was no foundation for Dr. Halebian's attempt to explain away the fact that Kendall had gotten into the tub on his own, and had once scaled a frog tank that was four feet off the ground. There was no evidence that

Kendall was unable to climb out of the tub by himself; respondents only testified that they had never seen him do so. Even if there were some basis to find that Kendall could not remove himself entirely from the tub, that would not account for Kendall's alleged failure to make at least some effort to escape.

Fourth, Dr. Halebian's opinion that the burn patterns on Kendall's arms could only have been caused by Kendall's turning the spigot to allow more hot water was based on experiments with the doctor's own bathtub, where the controls were *below* the faucet. By contrast, the water for respondents' bath was controlled by a "joystick" situated *above* the faucet.

Fifth, Dr. Halebian asserted that an adult "would have to be an octopus" to keep Kendall in scalding water for a sufficient amount of time for him to sustain the burns. Not only is that inherently questionable, but it was also disputed by Dr. Shapiro and contradicted by Dr. Halebian's own testimony that Kendall could not have gotten out of the tub by himself.

Sixth, Dr. Halebian admitted that Kendall would have been in great pain, and he does not seem convinced by his own explanation why Kendall would not have screamed out instantly:

> "I think the children—obviously one screams in pain, but if you've done something wrong [e.g., urinated in one's pants] and you're already in trouble and then you do something wrong again [e.g., turn the water controls to the hottest setting] maybe you would at least suffer the pain while you're trying to turn it back off and keep your mouth shut so you don't get in more trouble, I don't know . . . why wouldn't he get out of the tub, and that's a good question. I don't know. But I certainly think if you did an action and it caused pain, that rather than do something else you might try to undo the action."

In light of Dr. Halebian's other incredible claims, Family Court properly discounted his faith in the child's stoicism to bear the pain in silence.

Family Court discredited respondents' testimony for reasons which are also supported by the record, including the fact that Florence L. provided several different versions of the critical circumstances.

While respondents are correct that hearsay statements made by Kendall's brother, who was not a victim within the meaning

of Family Court Act § 1046 (a) (vi), were inadmissible (*see Matter of Nicole V.*, 71 NY2d 112 [1987]; *Matter of Laura W.*, 160 AD2d 585 [1990], *lv denied* 76 NY2d 706 [1990]; Family Ct Act § 1046 [b] [iii]), this was harmless error, given the undisputed facts and the medical expert testimony.

Accordingly, the orders of the Family Court, New York County (Jody Adams, J.), entered on or about March 26, 2001, which, upon fact findings that respondents had abused and neglected Kendall B., and derivatively abused and neglected Benjamin L., Tiffany L. and Christina G., subjected respondents to supervision by the Administration for Children's Services, should be affirmed, without costs.

TOM, MAZZARELLI, SULLIVAN and ELLERIN, JJ., concur.

Orders, Family Court, New York County, entered on or about March 26, 2001, affirmed, without costs.