OPINION OF THE COURT
Douglas E. Hoffman, J.
Introduction and Procedural History
Following fact-finding in this abuse proceeding pursuant to Family Court Act § 1012 (e), the court sets forth below its *712 findings of fact and conclusions of law. The Administration for Children’s Services (ACS) filed the instant petition on December 30, 2015, alleging that respondents Cristina C. (mother), Isom C. (father), Anthony C. (paternal grandfather) and Carla C. (paternal grandmother), abused the subject child, Isaac C., born July 9, 2015.
During the pertinent time period respondents lived together in the home of the paternal grandparents. On December 23, 2015, the parents brought Isaac to Mount Sinai Hospital after noticing swelling in the child’s leg. Examination and tests at Mount Sinai revealed a transverse femur fracture and, according to Mount Sinai physicians, a classic metaphyseal fracture (CML) and a distal radial buckle fracture. Mount Sinai’s attending child abuse physician, Dr. Katherine Grimm, who was covering for the hospital’s full-time child abuse specialist, Dr. Mandy O’Hara, was greatly concerned about possible child abuse. Dr. Grimm interviewed the parents, reviewed the child’s medical records, and recommended further testing, including a full skeletal survey.
On December 28, 2015, Dr. O’Hara returned to the hospital and became the primary attending physician. Tests revealed multiple rib fractures and swelling in the area of the femur. Within 48 hours, Dr. O’Hara wrote a letter to ACS asserting that the child’s injuries were indicative of child abuse, with no other reasonable explanation for the child’s injuries. Dr. Grimm refused to cosign the letter to ACS and took the extraordinary step of writing her own letter to ACS stating that: Mount Sinai tests revealed that the child may have rickets superimposed on a vitamin D level of zero, an extremely rare occurrence; any conclusion of child abuse was premature as further investigation was warranted as to possible metabolic causes of the child’s injuries; and those injuries may have occurred by regular handling of the child. Dr. Grimm noted that her interviews with the parents revealed loving, caring parents and that the parents did not appear to be of the type who would commit child abuse. On her own, Dr. Grimm consulted with Dr. Jack Levenbrown, an expert radiologist who did not work for Mount Sinai Hospital, and who for many years had served as a leading expert witness for ACS in numerous child abuse cases. Dr. Levenbrown ultimately testified as an expert witness for respondents at trial.
On December 30, 2015, ACS filed the instant abuse petition, asserting in pertinent part that the four respondents inflicted *713 or allowed to be inflicted upon Isaac physical injury, by other than accidental means, which caused or created a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, within the meaning of Family Court Act § 1012 (e). Petitioner claimed that the grandparents were individuals who were legally responsible for Isaac within the contemplation of Family Court Act § 1012 (g) and that respondents offered no reasonable explanation for Isaac’s injuries.
At the initial hearing before another judge, ACS sought removal and remand of the child to the Commissioner of Social Services. When the parents demanded a hearing pursuant to Family Court Act § 1028 challenging removal of the child, the initial judge recused herself and the matter was referred to the undersigned. Following that hearing, this court released Isaac to the maternal grandmother, permitted the parents to reside in her home with the child and to spend unlimited time with the baby, provided that the maternal grandmother or any other adult cleared by ACS supervise the parents.
The trial upon the petition encompassed nine days from May to August 2016. Dr. O’Hara and Dr. Henrietta Rosenberg, radiologist-in-chief at Kravis Children’s Hospital at Mount Sinai Hospital, testified for petitioner as expert witnesses. All respondents testified on their own behalf and Dr. Grimm (via subpoena), Dr. Levenbrown and Dr. Michael Holick, who was qualified as an expert in endocrinology, vitamin D and metabolic bone disease, testified as experts for respondents. Dr. O’Hara presented brief rebuttal testimony. The primary issue at trial was whether or not ACS carried its burden of proving abuse in light of expert testimony proffered by respondents asserting that Isaac’s injuries resulted from the conflation of extreme vitamin D deficiency and metabolic bone disease. The parties and the attorneys for the child submitted extensive posttrial memoranda and the court reserved decision. This decision and order follows.
Applicable Law
Family Court Act § 1012 (e) defines an abused child in pertinent part as:
“a [person] less than [18] years of age whose parent . . . inflicts or allows to be inflicted upon [the] child physical injury by other than accidental means *714 which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or . . . creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ.”
ACS posits that the paternal grandparents are people who were legally responsible for Isaac at the time of his injuries within the meaning of Family Court Act § 1012 (g), which states:
“ ‘Person legally responsible’ includes the child’s custodian, guardian, any other person responsible for the child’s care at the relevant time. Custodian may include any person continually or at regular intervals found in the same household as the child when the conduct of such person causes or contributes to the abuse or neglect of the child.”
The Court of Appeals, in Matter of Yolanda D. (88 NY2d 790, 795-796 [1996]), explained that the phrase “person legally responsible” within the meaning of this statute focuses upon any person having parental responsibility for a child or serving as the functional equivalent of a parent in a household or family setting. This is a fact-intensive inquiry. (Id. at 796.) The court must consider at least the following factors: frequency, nature and duration of contact; nature and extent of respondent’s control over the child’s environment; and respondent’s relationship to the child’s parents. (Matter of Keniya G. [Avery P.], 144 AD3d 532 [1st Dept 2016], citing Matter of Trenasia J. [Frank J.], 25 NY3d 1001, 1004 [2015].) In Yolanda D., the Court of Appeals stated that Family Court Act article 10 should not be construed to extend to a person who assumes fleeting or temporary care of the child. (88 NY2d at 796.)
Relying upon the logic underlying the negligence law doctrine of res ipsa loquitur, Family Court Act § 1046 (a) (ii) declares that
“proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent... of *715 such child shall be prima facie evidence of child abuse or neglect.”
Under this statute, a prima facie case of abuse can be established with respect to any legally responsible person who was caring for Isaac during the time period within which the injuries or condition arose. Thus, the identity of the actual abuser(s) need not be established. (See Matter of Philip M., 82 NY2d 238 [1993].) The evidentiary presumption commonly comes into play where, as here, petitioner asserts that the expert testimony established that the subject child’s injuries were not attributable to an accidental cause, but were instead the result of intentional or negligent conduct.
The evidentiary presumption in section 1046 (a) (ii) operates like many other legal presumptions. It does not shift the overall burden of proof from petitioner to respondents. When evidence sufficient to activate the presumption has been presented, a finding can be made unless respondents satisfy their burden of coming forward with an adequate alternative explanation. (See Matter of Philip M.; see also Matter of Davion E. [Latoya E.], 139 AD3d 944 [2d Dept 2016]; Matter of Melanie C. [Melissa L.], 136 AD3d 512 [1st Dept 2016]; Matter of Nabel C. [Amanda R.], 134 AD3d 504 [1st Dept 2015], lv denied 27 NY3d 902 [2016].) It is generally not sufficient for a respondent merely to deny that he or she caused the injury or does not know how it occurred, or to allege generally that others had access to the child, since that respondent has not thereby explained the injury. (Id.; Matter of Nyheem E. [Jamila G.], 134 AD3d 517 [1st Dept 2015].) Only a credible explanation for the injury can rebut the presumption. (Matter of Philip M.; see also Matter of Kaiyeem C. [Ndaka C.], 126 AD3d 528 [1st Dept 2015].)
In the instant proceeding, petitioner asserted that Isaac’s injuries were caused by other than accidental means. Thus, to establish its prima facie case, petitioner had to demonstrate that Isaac suffered injuries of such a nature as would not ordinarily occur absent an act or omission by respondents and that respondents were Isaac’s caretakers at the time of the injuries. (See Matter of Benjamin L., 9 AD3d 153 [1st Dept 2004].) It was not essential that ACS establish the precise date of the child’s injuries or link the injuries to an individual respondent. (Matter of Matthew O. [Kenneth O.], 103 AD3d 67 [1st Dept 2012].)
As this court found, infra, that petitioner established a prima facie case of abuse, at least with respect to respondent parents, *716 it was incumbent upon those respondents to provide a reasonable and acceptable explanation of how injuries of the nature and degree suffered by Isaac would have happened in the absence of abuse or neglect. (Id. [and citations therein].) As set forth, infra, the court finds that respondents in fact set forth an adequate alternative explanation for the child’s injuries. The ultimate issue, then, is whether or not ACS carried its overall burden of proving abuse against respondents.
Trial Testimony
Against the backdrop of the substance and timing of Isaac’s injuries, in light of the applicable law set forth above, the court next analyzes the testimony of each witness.
Dr. Mandy O’Hara
Dr. Mandy O’Hara is the current attending child abuse pediatric specialist at Mount Sinai Hospital and medical director of Mount Sinai Hospital’s Child and Family Support Program. She has served in this position since October 2014 and has been board-certified in child abuse pediatrics since November 2015. The court qualified Dr. O’Hara as an expert in the field of child abuse pediatrics, the third time she has been qualified by a court as an expert witness. It was not until December 28, 2015, five days after Isaac was admitted to the hospital, that Dr. O’Hara became involved in this child’s evaluation and treatment. In the interim, many significant events took place.
Through this witness and the child’s medical records, it was established that after Isaac’s admission to Mount Sinai on December 23, 2015, staff took X rays revealing a non-displaced transverse fracture of the child’s proximal right femur, as well as a possible periosteal reaction of the left femur. The child was admitted to the hospital where staff conducted a skeletal survey the following day. According to the consulting pediatric radiologist, Dr. Jack Rabinowitz, the skeletal survey indicated: (1) A distal right femoral metaphyseal corner fracture; (2) a transversely oriented non-displaced proximal right femoral fracture and associated soft tissue swelling at the level of the right femur; (3) asymmetric periosteal reaction in multiple long bones; (4) a possible buckle fracture of the left distal radius; and (5) cortical irregularity on two ribs on the lateral view only. Dr. Rabinowitz specifically noted that “[w]hile periosteal reaction may be seen in healing fractures, diffuse periosteal reaction may also be seen in systemic conditions *717 such as rickets” (emphasis added). The pediatric endocrinology team at Mount Sinai noted findings upon examination consistent with rickets.
Dr. O’Hara reviewed the medical records and the radio-graphs. She consulted with Mount Sinai physicians who were involved in Isaac’s diagnosis and treatment, including the emergency room physician who saw Isaac, and Dr. Grimm. Dr. O’Hara also consulted with Dr. Neil Lester and Dr. Rosenberg, both of whom are board-certified pediatric radiologists, as well as physicians from the endocrinology, orthopedics, hematology and ophthalmology departments.
The witness testified that she was initially and remained utterly convinced to a reasonable degree of medical certainty that Isaac’s injuries resulted from child abuse. Dr. O’Hara explained that the CML fracture resulted from forceful torsion or tugging of the leg and appeared in the X rays as a chip or bucket handle fracture at the growth plate or metaphysis of the long bone. As Isaac was five months of age at the time of the injury and was non-ambulatory, there was no accidental mechanism that could have caused this injury.
Similarly, the witness stated that the femur fracture resulted from a high impact and, in light of the absence of any trauma history, was highly concerning for non-accidental causation. The radial buckle fracture on Isaac’s right forearm, Dr. O’Hara asserted, was caused by weight or force applied along the length of a bone with sufficient strength to cause the bone to buckle. Again, given the absence of any reported trauma, this injury could not be explained by an accidental cause, the witness stated.
There was much testimony during trial as to two minor bruises on the child’s left knee above the thigh. Given the child’s age and lack of mobility or bleeding disorder, Dr. O’Hara opined that these bruises were non-accidental in origin and that they most likely resulted from a forceful grab of that leg.
Dr. O’Hara hypothesized that the soft tissue swelling in Isaac’s right thigh implied trauma to that part of his body. A second, follow-up, skeletal survey, Dr. O’Hara stated, revealed four bilateral rib fractures. Based upon their number and location, the witness testified, the injuries appeared to emanate from non-accidental causes, such as squeezing of the chest or application of direct force to those areas. While the rib fractures occurred roughly two weeks prior to the second skeletal survey, the fractures observed when the child was first brought to the *718 hospital were acute and had been incurred within days of the hospitalization, the witness stated.
Based upon consultation with other departments at Mount Sinai, Dr. O’Hara ruled out any non-accidental medical causes of the injuries, opining that, “[t]o a reasonable degree of medical certainty, these injuries . . . are consistent with non-accidental injuries superimposed on rickets.” The witness continued,
“given the complete absence of trauma history, no reported mechanism to explain any of these seven fractures, marked soft tissue swelling, a classic metaphyseal lesion, classic transverse femur fracture, unexplained bruising, in a non-ambulatory five-month-old infant, is diagnostic, to a reasonable degree of medical certainty, of inflicted injury or not by accidental means.”
With respect to the extremely salient issue of rickets, Dr. O’Hara opined that the underlying vitamin D deficiency rickets did not change her conclusion that the child’s injuries were non-accidental in nature. The witness explained that “rickets causes bone fragility and fracture risk in older toddlers and children who are ambulatory, cruising, crawling, walking, running” and not in an infant of Isaac’s age and ambulatory status, especially in light of the multiplicity and severity of the injuries. Based upon in-hospital consultation, including with pediatric radiologists, a geneticist, a hematologist and pediatric endocrinologists, Dr. O’Hara concluded that the degree of rickets was not severe from a radiological standpoint and that the rickets and/or the child’s vitamin D level of zero could not sufficiently account for these multiple and different fractures.
Based upon her conclusion that Isaac’s injuries were non-accidental in nature, Dr. O’Hara wrote to ACS on December 30, 2015 that the child’s injuries were highly suspicious for child abuse.
Dr. Henrietta Rosenberg
As its second witness, ACS called Dr. Henrietta Rosenberg, the radiologist-in-chief at Kravis Children’s Hospital at Mount Sinai. Dr. Rosenberg is board-certified in diagnostic radiology and pediatric radiology. The court qualified her as an expert in the field of pediatric radiology after it became clear that her proffered status solely as a fact witness would not permit her to testify to the extent sought by ACS. This is the second or third occasion in her career during which Dr. Rosenberg has *719 testified as an expert witness. Through the radiographic images shown to the court, Dr. Rosenberg provided a detailed explanation of the scope and nature of Isaac’s injuries, as well as her opinion as to the probable manner in which they occurred.
Dr. Rosenberg testified that the December 23, 2015 X rays showed a transverse fracture of the proximal shaft of the right femur, classic metaphyseal lesions in several bones, a buckle fracture of the left distal radius and suspicions of multiple rib fractures that were confirmed by the January 6, 2016 follow-up skeletal survey. The witness stated that the images indicated tremendous swelling of Isaac’s right thigh “all over the anterior and lateral aspect of the right femur,” which swelling raised the spectre of trauma in addition to that which caused the femur fracture.
The femur fracture, occurring 4 to 14 days prior to the child’s appearance at Mount Sinai on December 23, 2015, was not caused by regular handling of the child and its existence in the non-ambulatory infant was concerning for non-accidental trauma, Dr. Rosenberg testified. According to this witness, rib fractures, sustained in the same period as the femur fracture, were very concerning for abuse in a child who was not “cruising.” Dr. Rosenberg explained that ribs are generally very plastic in nature compared to other bones and are less likely to break in the absence of significant exertion against them.
Countering respondents’ anticipated explanation that bone demineralization played a primary role in the child’s injuries, Dr. Rosenberg testified that Isaac did not display signs of bone demineralization to the extent that would indicate a risk of fragility or a diagnosis of rickets, at least from a radiographic perspective, and certainly not to a level that would explain the child’s fractures. Dr. Rosenberg explained that the child’s images did not display any radiographic indicia of rickets and that she had not told either Dr. Lester or Dr. O’Hara that the child had signs of rickets. Concluding her testimony, Dr. Rosenberg opined that the radiographs did not indicate that Isaac had bone demineralization, bone fragility or rickets and that Isaac’s injuries did not occur in the course of normal handling.
Dr. Michael Holick
Dr. Michael Holick, board-certified in internal medicine, was the only endocrinologist to testify. He was qualified as an expert in endocrinology, vitamin D and metabolic bone disease. Dr. Holick is a professor of medicine, physiology and biophysics at *720 Boston University School of Medicine, and has taught at Harvard University and Tufts University. In addition to his medical degree, he has a Ph.D. in biochemistry. From 1987 to 2000, Dr. Holick served as chief of endocrinology at Boston University Medical Center. For the past 30 years, he has been the director of the Vitamin D, Skin, and Bone Research Laboratory at Boston University. According to the witness, he has seen over 25,000 patients with metabolic bone disease, has authored 13 books, 200 or more reviews, and more than 500 peer-reviewed scientific articles, including a number of articles on vitamin D deficiency and rickets. He has been described as one of the world’s leading authorities in the fields of metabolic bone disease, vitamin D and the physiology of calcium metabolism of vitamin D. (See Matter of Nicole C., 39 Misc 3d 1241 [A], 2013 NY Slip Op 50966[U] [Fam Ct, Kings County 2013].)
Directly contradicting petitioner’s witnesses, Dr. Holick testified with a “very high degree” of medical certainty that the subject child’s injuries resulted from normal handling of an infant with Isaac’s metabolic bone disease. Dr. Holick explained that the child had been extremely deficient in vitamin D for his entire life, including at least the last three months in útero. Based upon Isaac’s blood tests and the X rays, the witness stated that Isaac had classic signs of infantile rickets, which increased the child’s bone fragility to the extent that the child’s bones could break with normal handling.
Dr. Holick described his extensive experience with vitamin D deficient children, having seen one with at least 27 fractures, and stated with “greater than 99% certainty” that the subject child’s fractures could have been caused by normal parental handling. The witness described in great detail how such fractures come about. First, the collagen matrix for making new bones does not get properly mineralized. Once the body becomes vitamin D deficient, it compensates by increasing the level of parathyroid hormone, which, in turn, extracts calcium from the skeleton in an effort to maintain normal blood calcium levels. The increased parathyroid level results in a loss of phosphate. Inadequate phosphate results in inability to mineralize the collagen matrix that is being laid down by os-teoplasts (bone cells) causing the skeletal structure to become increasingly more fragile. The epiphyses (growth plates) at the end of the bones fail to close properly, resulting in radiolucen-cies (less dense or void bone area).
This expert witness explained that all three processes were found to be active in Isaac’s case. The child’s vitamin D level *721 was zero, representing one of the most severe vitamin D deficiencies the witness had observed in his lengthy and specialized career. The child’s alkaline phosphatase levels were also elevated, indicating that his bone cells were unsuccessfully trying to make new bone. Isaac’s parathyroid level was several times the normal level and his phosphorus level was extremely low. His calcium level confirmed that calcium was being leached from the child’s bones in his body’s attempt to compensate for the inadequate level of calcium in his blood. Dr. Holick explained that even vitamin D deficient patients usually have normal calcium levels; it is only when the body has depleted the calcium storage from a child’s skeleton that it can no longer maintain the child’s blood calcium level. Here, Isaac’s blood calcium had started to fall, indicating prolonged vitamin D deficiency, according to the witness.
Dr. Holick presented a somewhat different interpretation of the X rays from that presented by Dr. Rosenberg. Dr. Holick stated that the child’s X rays revealed radiolucencies at the ends of his bones. As the child could not properly calcify and mineralize collagen at the growth plates, his bones had demineralized gaps, which could be misunderstood and misclassified as CMLs, the witness stated; instead, these radiolu-cencies represented “classic signs” of infantile rickets.
Dr. Holick testified that Isaac also likely suffered from Ehlers-Danlos syndrome (EDS), a separate genetic disorder affecting the collagen elastic matrix, which also increased the risk of fragility fractures. The tests described by this witness appeared more subjective in nature and appeared to be a secondary theory of fragility. The expert witness made clear, however, that the subject child’s rickets and vitamin D deficiency alone could have caused the fractures.
Dr. Katherine Grimm
Dr. Katherine Grimm appeared pursuant to a subpoena and presented as a very independent expert in the field of child abuse pediatrics. From 1978 to 1997, Dr. Grimm served as director of the pediatric emergency room and ambulatory pediatrics at Mount Sinai. From 1997 to the present, she has been the medical director of the New York Center for Children, originally called the Children’s Advocacy Center. She continued to cover the child abuse pediatric program at Mount Sinai. In 2014, Dr. Grimm reduced her role at Mount Sinai to part-time status, and engaged in private practice. Dr. O’Hara was then hired on a full-time basis in the child abuse pediatric program. *722 Dr. Grimm continued to cover when Dr. O’Hara was not available. Dr. Grimm is board-certified in pediatrics, child abuse pediatrics, allergy and immunology. For a number of years, she testified as an expert on behalf of ACS and remains a consultant to ACS in its accountability review panel, which analyzes infant fatalities when that child was or should have been involved in the child protective system.
Mount Sinai Hospital called Dr. Grimm to consult on Isaac’s case on December 24, 2015. That day Dr. Grimm examined the child, reviewed blood work and consulted with a pediatric radiologist, Dr. Lester, as well as with a geneticist and an endocrinologist. The physician also interviewed the parents and consulted with the hospital’s child protection social work supervisor, Victoria Hartman, an ACS social worker and two detectives. Dr. Grimm noted that the radiology readings suggested non-accidental trauma, but that her interview with the family gave her pause, based upon the absence of what she considered to be child abuse risk factors.[1]
Dr. Grimm remained the consulting child abuse pediatrician until Dr. O’Hara’s return from holiday on December 28, 2015, although nearly all of her medical involvement in the case took place on December 24, 2015. During her interview with the parents, Dr. Grimm stated, the father noted that Isaac acted normally on the day preceding his hospital admission and that the parents had noticed swelling on the child’s right leg when they put him to sleep that night. After observing that the swelling was still present the next day and that Isaac was experiencing difficulty moving his leg, the parents immediately brought Isaac to Mount Sinai Hospital.
*723 Based upon the blood tests and her interview with the parents, Dr. Grimm was concerned that the child’s bones may be weaker than those of a normal infant. Although most child abuse pediatricians might find the injuries suspicious for non-accidental trauma, the witness stated, she believed that Isaac’s case was more complicated and warranted further inquiry. The witness explained that, from her knowledge of the relevant literature, vitamin D deficiency does not necessarily result in greater risk of bone fracture, but Isaac’s case, with such severe deficiency, is not commonly seen in the United States and is not addressed in the literature. Dr. Grimm also noted that the diagnosis of CML can be controversial and that radiologists may differ in their diagnoses. Based upon her decades of experience, and her perception that once a hospital takes a certain position, here, with respect to child abuse, other professionals in the hospital are loathe to contradict it, Dr. Grimm called an outside, independent radiologist, Dr. Jack Levenbrown, for consultation.
During this time, Dr. O’Hara had written a letter to ACS stating that the child had been abused and asked Dr. Grimm to sign on to the letter. Dr. Grimm refused to do so, stating that such a determination was premature and that much more testing and analysis had to take place under the unique circumstances presented before a reasoned determination could be made. Dr. Grimm testified that, following consultation with Dr. Levenbrown, she became convinced that Isaac’s injuries resulted from his underlying medical condition, not from child abuse.
Dr. Jack Levenbrown
For decades and in countless child protective cases ACS proffered Dr. Levenbrown as a leading expert in pediatric radiology in support of the agency’s petitions claiming child abuse or neglect within the meaning of Family Court Act article 10. Courts throughout New York qualified Dr. Levenbrown as an expert in various fields, including pediatrics, radiology and pediatric radiology. For the past several years following his partial retirement, Dr. Levenbrown has testified as an expert witness for respondents in several child abuse cases. He serves as an attending pediatric radiologist at North Shore Hospital. The Child Fatality Unit of the Office of the Queens County District Attorney consults with Dr. Levenbrown concerning trials based upon charges of murder or other serious injury. Although his primary experience with rickets took place abroad *724 many years ago, he has from time to time encountered children with rickets since that period.
In the instant case, Dr. Levenbrown testified as an expert for respondents. The physician reviewed all relevant images, medical records and transcripts of prior expert testimony in this trial. His testimony was concise and thorough. His conclusion that there was no child abuse was unequivocal. Dr. Leven-brown opined, to a reasonable degree of medical certainty, that Isaac’s fractures were caused by weakening of his bones resulting from vitamin D deficiency rickets. Regular handling of the child resulted in “normal force on abnormal bones.”
Dr. Levenbrown concluded that it was “unquestionable” that the child had rickets and that this was the cause of the child’s multiple fractures. The expert witness explained that blood chemistry evaluation is more revealing than X rays, as it “takes awhile for the x-ray changes to show up at the ends of the bone. The biochemistry comes first.” As Dr. Holick had testified, Dr. Levenbrown explained further that it takes 30-50% demineralization prior to demineralization actually appearing on an X ray.
With respect to the finding of a CML by petitioner’s expert witness, Dr. Levenbrown disputed this finding, stating that the image in question was an abnormality that is associated with rickets. The witness identified a number of indicia of rickets appearing on the child’s X rays and that the X rays already showed moderate demineralization, directly disputing Dr. Rosenberg’s testimony that the X rays did not reveal signs of rickets.
Dr. Levenbrown testified that the swelling on the child’s leg was in fact caused by normal handling, as the swelling could have been exacerbated by the parents standing the child upright and causing him to bear weight, an action that all respondents described as the parents having done, while holding the child’s hands.
Explaining the child’s rickets, Dr. Levenbrown testified that Isaac was “set up” for rickets by his mother’s low level of vitamin D. As a result, the mother’s low level of vitamin D was passed to the child in útero. The mother was not advised to and did not in fact take vitamin supplements and solely breastfed the child, setting up the child, in the witness’s phrase, for rickets. As the blood calcium and blood phosphorous levels were low, the blood alkaline phosphatase, an indicator of bone metabolism, was extremely high, and the blood parathyroid *725 level was also extremely high, demonstrating that the parathyroid glands were working overtime to obtain calcium from the bones for the blood, causing the bones to become increasingly fragile.
Reviewing the X rays, Dr. Levenbrown testified that one could observe signs of rickets on the child’s knee, lower femur and upper tibia. According to the doctor, the metaphysis was flared a bit, “almost like a trumpet,” and that the “first sign of vitamin D deficiency rickets ... is indistinct blurring or loss of . . . the provisional zone of calcification.” The witness observed “a little increase in distance between the metaphysis and epiphysis, because this is cartilage that isn’t getting calcified,” and that this was incorrectly called a classic metaphyseal lesion or CML. Dr. Levenbrown stated that a CML was not in fact evident: “With a CML, it’s a piece of bone pulled off. I don’t see the piece of bone there. I see an abnormality in the area where I would expect to see changes of rickets.” Later, the witness stated, “[l]ooking at the density of the bone itself, . . . you can see ... a Swiss cheese appearance as opposed to the normal.” The doctor noted further a “little widening of the cortex. These are changes of rickets.”
Similarly, the witness’s review of an X ray on Isaac’s left forearm revealed “cupping,” which he described as an
“abnormality of the distal radius and ulnar with some cupping and widening. Some flaring of the distal aspect of the bones which is really rickets changes, and really a bump ... a little buckling of the cortex . . . also, a little bending of this bone, which may have some relevance to the case, because in rickets the bones are softer and you could see bending.”
The bump, or buckle fracture in the wrist, continued the witness, did not indicate non-accidental trauma.
Dr. Levenbrown opined that the child’s transverse fracture represented a “crack in the bone, non-displaced fracture,” and that such a fracture was not highly specific for child abuse. Countering the testimony of petitioner’s witnesses, Dr. Leven-brown explained that this fracture did not have to be caused by high impact; rather, no high impact was required to cause a fracture on the child’s more fragile bones. The witness pointed out on the X rays that in a different view of the same body part, one could see periosteal elevation, but not the fracture, indicating that this was a minor non-displaced fracture that *726 probably would have healed on its own. The witness opined further that the swelling, though inordinate, was not localized as one would have expected to see from an impact injury.
Mother Cristina C.
Respondent Cristina C., 27, has been married to respondent Isom C. since 2013 and is Isaac’s mother. She conducts leadership training for the Intravarsity Christian Fellowship USA. Ms. C. and her corespondents all strongly denied any form of abuse toward Isaac. No respondent reported seeing anyone abuse the child, or the child having a significant fall. The mother testified that she and her husband were the primary caregivers for Isaac and that she, her husband and child lived in her in-laws’ home. The couple had their own bedroom and bathroom. Ms. C. stated that respondent grandfather left for work early in the morning and did not see the child, if at all, until late in the evening when he returned from work. On weekends, the family would spend some time together. At times, the grandfather would hold the child and sing to him while all respondents were in the kitchen getting ready for breakfast or lunch. On a few occasions, according to Ms. C., respondent grandmother would watch Isaac for a couple of hours if either parent were delayed returning home from work and there were a few occasions when the grandmother would take the child into another room for 15-30 minutes. During December 2015 when at least some of Isaac’s injuries occurred, the mother did not leave the child alone with either grandparent, to the best of her recollection.
Once she found out that she was pregnant, the mother received prenatal care and elected to engage a midwife at Midwifery NYC, where she had regular sonograms. As Isaac was born weighing four pounds, ten ounces, although full-term, he was placed in the NICU for a few days, and the family remained at the hospital for six to seven days before final discharge.
The parents took Isaac for all regular checkups and the mother exclusively breast-fed the child. The child’s pediatrician never advised the parents that the mother or child should take vitamin supplements. The pediatrician advised Dr. O’Hara that he had observed no problems concerning the child’s health or the parents’ care for Isaac. Prior to noticing swelling in Isaac’s leg on December 22, 2015, the parents believed that Isaac was healthy. He was gaining weight, rolling and bearing weight on his legs while being held. After observing the swell *727 ing, the parents took Isaac to Mount Sinai Hospital. At the emergency room, staff examined the child’s leg, moved it around, and the child did not exhibit signs of pain. Ms. C. brought the swelling to the staffs attention.
It quickly became clear to the parents that certain physicians at Mount Sinai had concluded that the child suffered from abuse and the parents became wary of cooperating further with the hospital. After Dr. O’Hara recommended brain imaging to determine if the child were bleeding from the brain or if there was shaken baby syndrome, the parents were concerned because one test required the baby to fast and to be sedated, and the other involved radiation. The parents agreed to the procedure, the baby fasted, but Mount Sinai canceled the procedure without explanation. The hospital asked to reschedule the procedure, but the parents refused permission to have the procedure performed other than when the child was an outpatient. After judicial intervention, the procedure was performed with the child as an outpatient and the tests were negative.
Father Isom C.
Respondent father Isom C., 29, confirmed the mother’s testimony. Mr. C. is a free-lance energy consultant for schools and property managers, and also owns and manages a residential and commercial cleaning company. He testified credibly that he has been a fully involved father to Isaac and loves his child very much. The parents coordinated their work schedules to arrange near full-time parental care for Isaac. On very limited occasions, a baby-sitter or the paternal grandmother filled in for a short time in an emergency, Mr. C. testified.
Paternal Grandfather Anthony C.
Respondent paternal grandfather Anthony C. is a news reporter for the Financial Times, where he has worked for the past 8V2 years. During the relevant time period, the grandfather left for work five to seven days per week very early and arrived home quite late, generally seeing his grandson in the evenings and on weekends, with very few minor exceptions, always in the presence of the child’s parents. Mr. C. has two other children.
The grandfather testified credibly that he was never the sole caregiver for the child and that he could not recall any instance in which he observed his wife to be the sole caregiver for Isaac. During the week, he might see the child a couple of times and would hold, talk or sing to his grandson. At times during the *728 weekend, he would take the child on the front stoop of their house or onto the back deck for 30-45 minutes to relieve the parents for that short period.
Mr. C. testified that he had no knowledge as to how the child sustained his injuries and never witnessed anyone hurting the child. The witness praised both parents’ love for and care for Isaac, noting that when the child was cranky, the parents were particularly attentive and would try very hard to figure out what was bothering the child.
Paternal Grandmother Carla C.
Respondent paternal grandmother Carla C.’s testimony confirmed that of the other lay witnesses. Ms. C. has been married to Anthony C. for 31 years and they have three adult children, including respondent Isom C. The elder C.s permitted their son Isom and daughter-in-law to move in with them in September 2015 when another apartment the younger couple had sought to rent did not work out. The grandparents occupy the first two floors of their three-family house. Isaac’s parents occupy the bedroom in the front of the house. The grandmother is the superintendent of their building and has a pet care boarding and walking business. She also provides storage space for customers’ personal property.
The grandmother also praised her son and daughter-in-law’s care of Isaac and testified that the parents provided primary care for the child during the day and always at night. When only one parent was at home, the grandmother would watch her grandson if the parent had to use the bathroom, shower or go on a brief errand, such as to the laundromat for 30-45 minutes. According to the witness, she occasionally changed Isaac’s diaper.
Ms. C. noted that both parents were great with Isaac and that she felt disappointed that her husband did not spend more time with Isaac. The grandmother testified that she loved Isaac and would never do anything to hurt him, as the child “is an extension of [her] son.” Finally, the witness never observed anyone hurt Isaac or touch him in other than a normal, loving manner.
Discussion
The court has set forth, supra, the standards it must employ in analyzing the evidence presented herein. Prior to determining whether or not Isaac was abused within the meaning of Family Court Act article 10, it first addresses whether or not *729 the grandparents are persons legally responsible for the child within the meaning of section 1012 (g).
Anthony C.’s role in the subject child’s life was clearly that of loving grandparent and not the functional equivalent of a parent. The Court of Appeals, in Matter of Yolanda D., set forth a non-exhaustive list of factors for the court to consider in determining whether an adult is a person legally responsible for a neglected or abused child. This “fact-intensive inquiry” (88 NY3d at 795) includes the frequency and nature of the contact between the grandfather and Isaac, the nature and extent of the grandfather’s control over the child’s environment, the duration of his contact with Isaac and the grandfather’s relationship to the child’s parents. The key, though, is, given analysis of these factors and all the circumstances presented at trial, whether or not the grandfather served as the functional equivalent of a parent to the child. He did not. Mr. C. so infrequently saw his grandson that his wife expressed disappointment that he was not playing more of a grandfatherly role in the child’s life. The grandfather’s time alone with the child was exceptionally circumscribed. He did not feed the child, provide for his medical care, take him outside of the home environment, tend to him when he was not feeling well, change his diaper or make any decisions concerning the child’s well-being. Although he loves his grandson, the child’s parenting, as it is commonly considered, was conducted by Isaac’s birth parents. The fact that the child lived in his parents’ section of the grandparents’ house does not, by itself, mean that the grandfather “controlled the environment” of the child within the meaning of Matter of Yolanda D. (id. at 796) or convert a very limited grandparent-grandchild relationship to one that may from a functional standpoint be considered parent-child in nature. The grandfather’s very “fleeting” interaction with the child does not establish, based upon the facts of this particular case, that he is a person legally responsible for Isaac. (Id. at 796.) Accordingly, the court dismisses the petition[2] as to respondent Anthony C.
*730 Whether or not Isaac’s grandmother, Carla C., is a person legally responsible for Isaac within the meaning of article 10 is a closer question. Although the grandmother baby-sat for the subject child from time to time, for approximately 30-90 minutes, it was the child’s parents who nearly exclusively cared for Isaac and who regularly arranged and rearranged their schedules so that at least one parent would be home with their son. Apparently, it was only on those occasions when a parent was running late that the grandmother filled in for a brief period of time.
The credible evidence establishes that Carla C. did not perform typical parental functions such as bathing the child or changing his diaper. In fact, when the diaper needed to be changed and a parent was present, the grandmother would say to whichever parent was present, “here’s your son.” The parents and child lived in the same house, but not the same household, as the grandparents. It was only after the parents’ housing fell through in September 2015 and the grandparents offered the parents and their child housing on an exigent basis, that the parents moved into the house of the grandparents. They were not an integrated family or household unit, and there was no evidence that the parents and grandparents were financially interdependent or were other than independent couples who lived under the same roof on an exigent basis. Prior to that time, both the parents and grandparents lived in distinct locations and within separate family units. The parents and Isaac had their own bedroom and bathroom. There was no evidence that the parents or grandparents intended for this living arrangement to be permanent or even long-term. The parents were almost completely self-sufficient insofar as it concerned caring for Isaac.
Prior to the parents and subject child moving into the grandparents’ house in September 2015, the grandmother played the quintessential grandparent role, visiting the child at times, playing with him and enjoying his presence and development. The fortuity that the parents suffered a setback concerning their own housing and moved into a section of the grandparents’ home on a temporary basis did not significantly *731 alter the grandmother’s role from that of loving grandparent to one of a functional equivalent of a parent. As described above, her role in caring for the child was very limited both temporally and substantively. Only the parents cared for the child at night and they took care of their son almost exclusively during daytime. As the grandmother testified, she watched the child for only very short periods of time when, for example, the parent at home took a shower or went to the laundromat. There is virtually no evidence that the grandmother cared for Isaac at all during the pertinent time frame, December 2015, when the child’s injuries took place. There were two full-time parents who went to great lengths to ensure that they took care of all of their child’s needs; thus, there was no need for anyone else to fulfill a “parental” function. Under all of these circumstances, the court finds that Carla C. was not a person legally responsible for Isaac during the pertinent time frame within the meaning of Family Court Act § 1012 (g) and dismisses the petition against her.[3]
The key issue, of course, is whether or not either or both parents abused Isaac or failed to protect their young child from abuse. As this court found, supra, ACS established its prima facie case of abuse. Other than the lay testimony and the court’s subsequent findings as to credibility, discussed both supra and infra, the trial essentially consisted of fundamentally conflicting expert testimony.
All of the trial evidence supports the finding that at the times Isaac C. incurred his injuries, he was, from a medical standpoint, a very unique child. Isaac not only had rickets but had the extraordinary vitamin D level of zero. The court finds that all of the expert witnesses testified sincerely based upon their experience, knowledge, medical beliefs and training. It is primarily the greater and more relevant knowledge and experience of respondents’ expert witnesses with respect to a child with Isaac’s medical configuration that makes respondents’ arguments that there was no abuse here more cogent.
All witnesses testified, of course, through the prism of their own experiences. Dr. O’Hara’s professional world is one of child abuse investigation and confirmation when she considers it appropriate from a medical and psychosocial standpoint to so find. With respect to overall experience and willingness to *732 consider alternative viewpoints and potential findings, Dr. Grimm and Dr. Levenbrown presented as more convincing witnesses.
Dr. Grimm has more than 30 years experience in the field of child abuse pediatrics and was the physician initially assigned at Mount Sinai to Isaac’s case. While the multiple fractures raised obvious suspicion on the part of medical staff, in light of all the circumstances, Dr. Grimm and other physicians at Mount Sinai were not certain that abuse had taken place, and convened a multidisciplinary meeting on December 30th to discuss whether or not Isaac’s degree of rickets sufficiently explained his fractures. By this time, however, Dr. O’Hara had decided that abuse had definitely taken place and had conveyed that information to ACS.
Dr. O’Hara acknowledged that Isaac’s case was “unusual” and that the child’s blood tests and X rays showed rickets. The witness also stated that rickets causes bone fragility and that bone fractures are a possible complication of rickets. Trial evidence established that Dr. O’Hara is not an expert in metabolic bone disease, rickets or vitamin D deficiency and that she had not had any experience whatsoever with a child whose vitamin D deficiency matched or even approached that of Isaac. The witness was unable to provide meaningful information as to whether or not the child’s injuries resulted from normal pressure on abnormal bones. To the extent that she responded to cross-examination as to rickets, the physician agreed to some extent with respondents’ expert witnesses. Dr. O’Hara acknowledged that a child with rickets does not properly absorb calcium and, consequently, the bones do not calcify properly, and that calcium may be taken from a child’s bones to maintain calcium homeostasis in the blood. The witness acknowledged further that all of Isaac’s fractures were in areas where rachitic changes were observed, that the femur fracture was in the same area where rickets affects bone growth and that osteopenia, which is a loss of bone density, was compatible with rickets and was observed on the child’s right femur.
Dr. O’Hara’s letter to ACS appears to have been premature, as it was drafted the day following her assignment to the case and prior to the multidisciplinary team meeting or any further testing. Thus, while her testimony was relevant in establishing ACS’s prima facie case, it did not serve meaningfully to overcome respondents’ opposing expert and lay testimony *733 establishing an organic, non-abuse-related basis for the child’s fractures.
It became clear from all of the expert testimony that radiological studies and blood work conveyed great information as to the child’s susceptibility to fractures. It is equally clear that highly experienced radiologists may issue greatly varying findings from the same set of radiographs. It appears that Mount Sinai radiologists differed in their interpretations of Isaac’s X rays. Dr. O’Hara noted that both Dr. Rosenberg and Dr. Lester found evidence of rickets in the radiographs. All parties herein produced expert testimony concerning Isaac’s X rays.
Dr. O’Hara testified that in her consultation, Dr. Rosenberg found evidence of rickets, as did Dr. Lester, who works directly with Dr. Rosenberg. During her testimony, however, Dr. Rosenberg asserted that the child displayed no signs of rickets. Dr. Rosenberg is a highly accomplished pediatric radiologist. At the outset of her testimony, it was apparent that Dr. Rosenberg was not as familiar with Isaac’s case as were the other expert witnesses, as it was her stated understanding that she was going to be called as a fact witness only, not as an expert. The witness testified that her sole role in Isaac’s original diagnosis and treatment was as a brief “curbside” consultant to an endocrinologist and to Dr. O’Hara at Mount Sinai concerning Isaac’s X rays. She did not review the child’s blood tests or any other aspect of the child’s medical records. The medical records in evidence indicate that Dr. Rosenberg informed a pediatric endocrinologist that the child’s X rays in fact showed cupping and splaying in the distal radius and ulnar cupping suggesting rickets. Dr. O’Hara, upon cross-examination, stated that Dr. Rosenberg specifically confirmed that rickets appeared on Isaac’s X rays. Petitioner’s exhibit one in evidence, which included radiology reports from physicians who reported directly to Dr. Rosenberg, repeatedly noted radiographic evidence of rickets, including cupping, fraying, splaying, rachitic rosary and other metaphyseal changes, together with decreased bone density. Mount Sinai medical records reflected a conversation between Dr. Rosenberg and an endocrinologist, Dr. Rapaport, in which Dr. Rosenberg apparently stated that the child’s X rays were concerning for metabolic bone disease, and the cupping and splaying observed suggested rickets. As impressively credentialed as this witness is, and as sincerely as she expressed her findings, the inconsistencies in the *734 evidence concerning this witness’s conclusions, perhaps caused by the confusion as to her role at trial and her subsequent quick review of the radiographs, undercut the strength of her testimony.
In addition to the issues set forth above concerning the conclusions of abuse proffered by petitioner’s expert witnesses, respondents’ expert witnesses firmly established a very credible non-abuse-related basis for the child’s injuries. All three highly experienced medical experts testified that to a reasonable degree of medical certainty, the child’s multiple fractures resulted from bone fragility emanating from metabolic bone disease.
Dr. Grimm’s experience in child abuse pediatrics is superior to that of Dr. O’Hara. For nearly 20 years, she has served as the medical director of the New York Center for Children, has maintained a significant role covering Mount Sinai’s child abuse pediatric program, has continued to testify four to six times annually for ACS in abuse cases and has continued to serve as a consultant to ACS. She presented as a thoughtful, very concerned physician with a willingness to consider alternative bases for injuries that, on their face, raised concerns of child abuse. Although called at trial as an expert for respondents, Dr. Grimm had not been retained by respondents and testified only after having been served with a subpoena.
The court found Dr. Levenbrown to be a highly credible expert witness who has had extensive relevant experience concerning the medical issues applicable to Isaac’s condition. All medical expert witnesses, with the exception of Dr. Rosenberg (at trial), established that Isaac had a vitamin D level of zero and had rickets. As Dr. Holick stated, Isaac’s vitamin D deficiency was one of the most severe he had ever seen. Neither of petitioner’s medical experts had ever dealt with such a case. Dr. Holick testified that Isaac’s rickets severely compromised the integrity of his bones as vitamin D was needed to facilitate bone calcium absorption and that any new bone could not be mineralized properly without it, increasing the risk of fragility fractures. In addition, the witness stated, prolonged vitamin D deficiency lead to the removal of calcium from the bone to provide calcium for the blood, resulting in further erosion of the child’s bone density and increasing the risk of bone fragility. The vitamin D deficiency lead to increase in the parathyroid hormone level which then sought to extract calcium from the skeleton and place it in the blood stream. Dr. Holick testified *735 credibly that Isaac’s parathyroid hormone level was three times that of a normal child, indicating the body’s attempt to maintain a proper calcium level in the blood by extracting it from the bones. According to Dr. Holick, the increase in the parathyroid hormone level caused a loss of phosphate, which also prevented mineralization of the collagen matrix, resulting in a marked increase in bone fragility. Dr. Holick concluded that Isaac’s bones had such a low level of calcium that the parathyroid hormone could no longer maintain a normal blood calcium level.[4]
Based upon all of the credible evidence, it appears to the court that Dr. Levenbrown and Dr. Holick possessed superior knowledge of this child’s condition and of the factors that led to his fractures. They both concluded that Isaac’s fractures, given his underlying medical conditions, resulted from normal handling. Dr. Levenbrown testified that Isaac’s bone fragility was such that even holding his hand or hugging him normally could have resulted in fractures. The three expert witnesses called by respondents testified that the deep tissue swelling on the child’s right leg was consistent with accidental injury, most likely from minor weight bearing. To the extent that the limited scientific literature introduced into evidence had direct relevance to Isaac’s fractures, it contained support for the possibility of this child’s injuries being caused by his underlying medical conditions. Even if, as petitioner posits, a relatively small fraction of children with rickets suffers the number and types of injuries occurring herein, the one of ten, one of a hundred, or even one of a thousand cases involve at least one child. The preponderance of the credible evidence indicates that this appears to be that case.
Dr. Levenbrown’s testimony was particularly thorough and well-reasoned. The court found that Dr. Holick presented well, from an endocrinological perspective, the bases for the child’s injury. Petitioner did not present an expert in endocrinology to counter this testimony. This was particularly important because, although Dr. Holick’s testimony concerning the child’s bone fragility caused by vitamin D deficiency rickets made much sense, and corroborated other credible expert medical testimony, his secondary diagnosis, that Isaac also likely suffered from Ehlers-Danlos syndrome, appeared to the court to be based upon rather superficial evidence. This disease affects *736 the collagen elastic matrix and also increases the risk of fragility factors. There is no genetic test for EDS; rather, Dr. Holick diagnosed respondent mother with EDS by a multi-factored test score, then concluded that Isaac probably had EDS based upon the mother’s diagnosis, some scarring on the child’s leg and blue sclera observed in the child’s eyes, plus reported red marks, bruises and joints that made a clicking sound. The court had to view the testimony through the eyes of a layperson and it appeared, even through that lens, that the interview of the mother was superficial in nature and that the conclusion of EDS was a reach. However, there was no expert testimony presented on rebuttal to contradict the diagnosis of EDS. The fact remains, however, that both Dr. Levenbrown’s and Dr. Holick’s expert testimony as to Isaac’s vitamin D deficiency and rickets and how these conditions likely manifested themselves as the child’s fragility fractures appear sound to the court and as more nuanced, more thoroughly conducted analyses of the subject child’s fractures.
Finally, the court notes that it cannot know for certain whether or not either parent abused Isaac. Petitioner raised many serious concerns during both its case-in-chief and during rebuttal. The court had the opportunity to consider all of the expert testimony discussed above and observed both parents during their testimony and throughout the trial. Based upon their testimony and their demeanor the court found the parents credible. Considering all of the expert and lay testimony adduced at trial, the court finds that petitioner did not carry its burden of proving that any respondent abused or neglected Isaac. Accordingly, the court dismisses the petition.

. The court did not permit the various witnesses to testify as to what they considered to be the presence or absence of primarily socially and economically related “risk factors” for child abuse. There was no scientific basis proffered for such an analysis, which, for example, focused upon whether or not the parent had been in foster care, had suffered abuse as a child or homelessness. The court notes that Family Court Act § 1046 (a) (1) permits proof of abuse or neglect of one child to be admitted as evidence concerning abuse or neglect of any other child. In enacting this provision, the legislature did not permit socioeconomic and other indicia of poverty to be admissible as proof of abuse or neglect of a child, which would be the effect of allowing such evidence. Further, as a practical matter, the court is concerned as to how utilization of such a scale could sway analysis concerning particular groups, resulting in a disproportionate impact upon those groups as to findings of abuse and, consequently, placement of children into the foster care system. Whether or not there was child abuse remains a highly individualized determination based upon the competent evidence adduced at trial.

. Assuming arguendo that the court had found that Anthony C. was a person legally responsible for Isaac within the meaning of article 10, the court would have dismissed the proceeding against the grandfather on two other bases. As discussed, infra, the court found that Isaac was not abused. In addition, the court had the opportunity to hear all of the testimony by Mr. C. and to observe Mr. C. through the entire trial. Based upon the court’s observation of his demeanor on the witness stand and also upon other wit *730 ness testimony concerning the grandfather, the court found Anthony C.’s testimony that he did not abuse Isaac in any manner or had any reason to believe that the child was abused by another entirely credible and would have dismissed the petition against him on this separate basis, following respondents’ successful proffer of a non-abuse-based explanation for the child’s injuries.

. As with the grandfather (see n 2) the court would have dismissed the petition as against the grandmother on the same two alternative bases, having found her testimony entirely credible.

. For a more detailed explication of this process and of Dr. Holick’s expertise, see Matter of Nicole C.